# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ROBERT HILLER,** Individually, on behalf of
his minor child, and as Personal Representative
of the Estate of Carolyn B. Hiller, deceased,

**Plaintiff,**

v.                                                          **CIV No. 02-1231 LH/RLP**

**CHRISTOPHER R. FLETCHER, M.D.,**

**Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment
Pursuant to FED.R.CIV.P. 56 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579
(1993)(Docket No. 78) as well as on  Plaintiff's Motion to Supplement His Response to Defendant's
Motion for Summary Judgment Pursuant to FED.R.CIV.P. 56 and *Daubert v. Merrell Dow
Pharmaceuticals*, 509 U.S. 579 (1993) (Docket No.  97).   For the reasons stated, Plaintiff's motion
to supplement is **granted** and Defendant's motion for summary judgment is **denied.**   Plaintiff's
experts shall be permitted to testify as specified herein.

1

**I.  Overview**

This diversity case is a wrongful death/medical malpractice action that arose after Defendant Dr. Fletcher's care and treatment of Carolyn Hiller (deceased).  Subsequent to being in the care of Dr. Fletcher, Ms.  Hiller was diagnosed with breast cancer, dying less than a year following the cancer diagnosis.

Defendant frames the issue on summary judgment as being whether the opinions and conclusions of Plaintiff's experts are sufficiently reliable to allow them to testify on  matters proposed by Plaintiff, and particularly to opine as to their interpretation of notes taken by Dr. Fletcher contemporaneously with his treatment of Ms. Hiller (Deft's Mem. in Supp. of Mot. Sum. Judg. at 6).  Success of Defendant's motion for summary judgment is predicated on  findings by the Court that Plaintiff's two expert witnesses are unreliable under *Daubert*[1] principles and FED.R.EVID. 702 and 703, and should be stricken from consideration on summary judgment.  Defendant asserts that summary judgment should be granted because, without expert testimony, Plaintiff will not be able to establish the essential elements of his negligence claim.

Defendant's motion focuses largely on the admissibility and/or effect of several key pieces of evidence.  This evidence includes medical records and Dr. Fletcher's deposition testimony.  It is this evidence upon which Plaintiff's experts rely in formulating their opinions, which opinions Defendant seeks to exclude.  There is no dispute as to the content of these pieces of evidence, which is largely set forth below.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

## II.  Undisputed Evidence

Defendant performed a physical examination of Ms. Hiller on August 21, 1998.[2]  Dr. Fletcher testified that during the course of this prenatal physical examination, Ms. Hiller told him that someone in California had previously found an adenoma, that had not changed over several years, four years. (Fletcher Depo, p. 81)[3].  He testified that he asked her where it was located, and she said, "it's up here somewhere by the shoulder."  (*Id*. at 86).  He stated that he and Ms. Hiller attempted to palpate the adenoma, with Ms. Hiller in three different positions, without success.

Following this examination, on August 21, 1998, Dr. Fletcher hand-wrote a note in Ms. Hiller's Prenatal Record under the topic "Abnormalities on exam" stating:  " ?adenoma L upper breast-mass present x years [without change]".  Following the subsequent delivery of Ms. Hiller's child, Dr. Fletcher incorporated this same note, verbatim, into his dictation of her Discharge Summary.

On August 17, 2000, in Oxford, Mississippi, Ms. Hiller saw a general surgeon whose practice was limited to breast surgery, Dr. Catherine Gleason.  At that time, Ms. Hiller gave this history to Dr. Gleason's nurse:  "Ms. Hiller has had a lump in the upper inner quadrant for five years and it has not changed.  There is a new lump in the upper outer quadrant of the left breast."  (Deft's Ex. E).  That same day, Ms. Hiller gave this history to Dr. Gleason:  that she had complaints of a breast mass four

---

[2]  The parties disagree as to whether this physical exam occurred on July 31 or August 21, 1998.  For purposes of this opinion only, the Court will accept the date of August 21, 1998, for this disparity is irrelevant to the Court's analysis.

[3]  Dr. Fletcher's deposition was attached as an exhibit to a brief previously filed, Defendant's Memorandum in Support of Motion to Strike Plaintiff's Experts Pursuant to FED.R.CIV.P. 37(c) (Docket No. 29).  Defendant has incorporated by reference the transcript of Dr. Fletcher's deposition and medical records that were attached to this prior brief, pursuant to FED.R.CIV.P. 10(c).

years before that has increased in size; that she had seen an unidentified doctor in New Mexico before she got pregnant, who evaluated the lump and told her it was benign (Deft's Ex. F).  On August 21, 2000, Ms. Hiller gave this history to her oncologist, Dr. Kurt Tauer:  that she had known about a mass just prior to and subsequent to the birth of her child, that it had been checked several times by physicians, but evaluated by them to be normal changes in breast tissue during pregnancy, and that these physicians reassured her that this was nothing to worry about.  (Deft's Ex. G).

**III.  Analysis**

Defendant's motion hinges on the issue of admissibility of a source of facts, namely, expert witness testimony.  In order to grant Dr. Fletcher's motion for summary judgment, the Court would need to rule that the expert witness testimony is inadmissible.

Defendant contends that Plaintiff's experts' opinions are unreliable and inadmissible because they are based up statements that are hearsay, as contained in Exhibits E, F, and G.  He argues that such statements are inadmissible under FED. R. EVID. 703 and 803(4).  These exhibits are records that contain medical history given by Ms. Hiller to a nurse and two doctors in Mississippi in the year 2000.  The content of these notes is stated above.

Defendant also objects to these opinions because they contradict his testimony and because the experts rely only upon "their knowledge, experience and vague generalities.  No peer reviewed, objective, generally relied upon materials were used."  (Deft's Mem. at 13-14).

**A.  Defendant's Exhibits E, F and G**

The exhibits in question satisfy FED. R. EVID. 703.  To meet the requirements of Rule 703, the

4

facts or data must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject. . . ." *See Daubert* at 595 (quoting FED. R. EVID. 703). In evaluating a patient's general medical history, experts in medical malpractice cases commonly review medical records. Consideration of Exhibits E, F, and G is appropriate in examining potential liability in this case. Defendant remains free to challenge any expert's opinions through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert* at 596. Experts in this case will be allowed to consider Exhibits E, F, and G in their opinions.

Further, experts in this case will be allowed to refer to Exhibits E, F, and G in their testimony under FED. R. EVID. 803(4). Rule 803 (4)'s exception to the hearsay rule provides for the admission of statements made for purposes of medical diagnosis or treatment. The statements are admissable because of the presumption that the patient's motive guarantees trustworthiness. *United States v. Pacheco*, 154 F.3d 1236, 1240 (10th Cir. 1998) (because a patient's medical care depends on the accuracy of the information she provides, the patient has a selfish motive to be truthful; consequently, a patient's statements to her physician are likely to be particularly reliable). The self-interested statements are an exception to the hearsay rule if they are of the type reasonably pertinent to a physician in providing treatment. *United States v. Iron Shell*, 633 F.2d 77, 83-85 (8th Cir. 1980). The reporting of symptoms is pertinent information a medical doctor would rely on in an examination. While Ms. Hiller's reported information in Exhibits E, F, and G does not independently lead to diagnosis and treatment, the identification of possible symptoms contributes to a medical history that is useful in an expert's analysis of appropriate evaluation and diagnosis of the patient. (Deft.'s Ex. D, Norcross Depo., p. 107-08). The recording of Hiller's symptoms falls

within *Iron Shell* and the plain language of Rule 803 (4) as exceptions to the hearsay rule.

Defendant properly identifies a situation where Rule 803(4) does not except medical statements from the hearsay rule.  The case of *Gong v. Hirsch*, 913 F.2d 1269, 1273-1274 (7th Cir. 1990) states that a doctor's opinion can be excluded from the Rule 803(4) exception in certain situations.  In that case, the excluded doctor's letter, intended to help Gong secure employment benefits, was an opinion detailing the causes of Gong's medical problems.  *Id.* at 1272.  Because the letter was an evaluation of a non-treating physician and was offered for reasons beyond the patient's treatment, the Court concluded that the intent and content of the letter removed it from the Rule 803(4) hearsay exception.  The exhibits in question are distinguishable from those examined in *Gong*.   Exhibits E, F, and G do not offer medical conclusions and are not intended for use in procuring benefits. Instead, the challenged exhibits are doctors' notations of reported symptoms and objective data that could be used in the future for diagnosis.  The exhibits in question do not exceed the bounds of the Rule 803(4) hearsay exception.  The contents of these exhibits are allowable statements for experts to consider and to testify about in this case.

## B.  Reliability of Plaintiff's Two Medical Experts

As noted above, Defendant's motion challenges the reliability and admissibility of the testimony of two of Plaintiff's medical experts.  Defendant asks the Court to conduct a *Daubert* analysis of the proffered testimony of Drs. Norcross and Van Scoy-Mosher and  to exclude their testimony.  Based upon the approach taken in *Truck Ins. Exch. v. Magnetek, Inc.*, 360 F.3d 1206 (10th Cir. 2004), Defendant then asks the Court to grant summary judgment in his favor, on the grounds that if this expert testimony is excluded, no rational trier of fact could find in Plaintiff's

favor.

Rule 702 of the Federal Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court has laid out a framework for analyzing proffered expert testimony in the so-called *Daubert* trilogy, which consists of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Pursuant to *Daubert*:

> The trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert* at 592-93.

The touchstone of admissibility under Rule 702 is helpfulness to the trier of fact.  *See Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always the same: "[t]o make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire* at 152, *quoted in Dodge v. Cotter Corp.*, 348 F.3d 1212, 1222-23 (10th Cir. 2003).

7

In performing its "gate-keeping" function, the trial court may only admit reliable and relevant expert testimony. *Daubert* at 589-91. In performing this function, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. *Id*. at 592. The expert's testimony must be based on scientific knowledge, implying a grounding in the methods and procedures of science and must connote more than subjective belief or unsupported speculation. *Id*. at 590. The inquiry is to be a flexible one, and "must be solely on principles and methodology, not on the conclusions they generate." *Id*. at 595. In making its initial determination of reliability, the Court has broad latitude to consider whatever factors the Court finds useful, and the particular factors will depend on the unique circumstances of the expert testimony involved. *Kumho Tire* at 152.[4] Reliability is to be assessed in light of the particular facts and circumstances of the case. *Kumho Tire* at 158.

A review of post-*Daubert* caselaw indicates that the rejection of expert testimony is the exception rather than the rule. FED.R.EVID. 702 Advisory Committee's Notes. The trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, which may entail vigorous cross-examination, presentation of contrary evidence and careful instruction on the applicable burden of proof, the traditional and appropriate methods to attack potentially weak, yet admissible evidence.

---

[4] Defendant relies heavily upon the following factors enunciated in *Daubert* that *might* aid the court's function in ensuring reliability: (1) whether the theory or scientific technique can be tested or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error associated with the methodology; (4) whether there are standards controlling the technique's operation and whether they were maintained; and (5) whether the theory or technique is generally accepted within the relevant community. *Daubert* at 593-94. The Court "may" apply these factors if necessary, but the "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire* at 141. District courts have broad discretion to consider a variety of other factors. *Id*. at 150. "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Kumho Tire* at 153.

In addition to broad substantive discretion, this Court also has been afforded broad procedural latitude.  As noted by the *Kumho Tire* case (in which no *Daubert* hearing was held), a trial court's decision "whether or when special briefing or other proceedings are needed to investigate reliability" enjoys the same deference as its decision "whether that expert's relevant testimony is reliable." (emphasis omitted).  *Kumho Tire* at 152; *see also United States v. Velarde*, 214 F.3d 1204, 1210 (10th Cir. 2000).  A *Daubert* hearing is but one method by which a district court may fulfill it's gatekeeper function, and this obligation is one that can be satisfied, as in this case, where the "court has sufficient evidence to perform the task."  *See Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087-88 (10th Cir. 2000).  This Court clearly has discretion to limit the information upon which it will decide the *Daubert* issue[5].  Defendant has placed the issue squarely before the Court, and both parties have submitted ample evidence for the Court to decide the issue at this juncture. Given these circumstances, the Court finds it unnecessary to hold an evidentiary hearing, but has chosen instead to perform the reliability analysis, based on the briefs and factual record before the Court.

## (1)  Qualifications of Dr. Norcross and Dr. Van Scoy-Mosher

Defendant does not dispute that these two doctors are qualified as medical experts, nor does he object to this Court's acceptance of them as experts.  Dr. William A. Norcross, M.D., is a board certified family practitioner with thirty years experience.  He is a full-time faculty member at the University of California, San Diego, where he teaches residents and medical students and is the

---

[5]  *See United States v. Nichols*, 169 F.3d 1255, 1262-63 (10th Cir. 1999).  *See also United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999)(district court granted great latitude in "deciding whether to hold a formal hearing.").

Director of the UCSD Physician Assessment and Clinical Education Program ("PACE"). Dr. Norcross created a medical-record keeping course for PACE, which is one of the largest in the country, that provides specific education for doctors in keeping quality medical records. Prior to starting the PACE program, he was a certified examiner on the Medical Board of California, which involved the review of medical records of doctors who were being investigated. (Norcross Depo at 36, 38). Defendant offers no objections to his qualifications. Dr. Norcross possesses specialized knowledge, skill, experience, training and education and he is accepted by this Court as an expert.

The qualifications of Dr. Michael B. Van Scoy-Mosher are likewise undisputed. He is board certified in internal medicine and medical oncology. He is the Medical Co-Director of the Breast Center at Cedars-Sinai and has been for the last two years. He runs its Breast Cancer Tumor Board, which he founded twenty years ago.[6] He has written numerous publications on the subject of breast cancer. (Van Scoy-Mosher Depo at 125, 126) Dr. Van Scoy-Mosher possesses specialized knowledge, skill, experience, training and education and he is accepted by this Court as an expert.

## (2)  Proffered Opinions of Dr. Norcross

Defendant objects to admission of Dr. Norcross's opinions and his interpretation of medical records made by Dr. Fletcher. The medical records of August 21,1993 and the discharge summary following the delivery of Ms. Hiller's child are at issue. At pages 55-56 of his deposition, Dr. Norcross testified:

---

[6] The Tumor Board is a monthly education session for the hospital staff on breast cancer (Van Scoy-Mosher Depo at 126).

But clearly, under "abnormalities on exam," it says, "Questionable adenoma in the left upper breast, mass present times years without change."

And it is my testimony and my belief that this is exactly the way a physician would document a dominant mass that he palpated in the breast but he thought was benign, which is why he goes out of his way to say "mass present for years without change." If this is not enough, he does it again at the discharge summary after her delivery, in which he says – after the history, he then says, "She had no abnormal findings on history and physical. There was a questionable adenoma in the left upper breast, a mass that had been present for years without change." That is the way a doctor would document a breast mass that he himself palpated. I consider that extremely strong factual evidence that he palpated a mass.

Pursuant to *Daubert* and its progeny, it becomes incumbent for the Court to examine the bases stated by Dr. Norcross for his various opinions. Dr. Norcross stated that he based his opinion that Dr. Fletcher palpated and documented a dominant mass in the breast that he thought was benign, on: (1) the content of Dr. Fletcher's medical records; and (2) the fact that Ms. Hiller later had cancer in this breast. (Norcross Depo at 55). Later in his deposition, he stated that another factual basis for his interpretation of Dr. Fletcher's note is the history that Ms. Hiller gave to her subsequent physician, Dr. Gleason, i.e., that Ms. Hiller had been told that a mass was present, but not to worry because women her age do not get cancer. (*Id*. at 72). On pages 68-69 of his deposition, Dr. Norcross stated that the foundation for his opinion about the medical records is 30 years of practicing medicine and reading medical records, creating medical records, and teaching other doctors how to create proper medical records. He testified that this foundation provided a basis for his interpretation of Dr. Fletcher's notes contained in the "physical examination abnormality" section. Specifically he testified that these notes indicated that Dr. Fletcher felt a breast mass and was trying to reassure himself and any subsequent readers of the notes that it had been present for years and had not changed. He testified that Dr. Fletcher's own notations indicate what Dr. Fletcher was thinking, that medical records exist so that doctors can communicate to other doctors what they

are thinking, and what was actually happening when they examine a patient (*Id.* at 70).  When asked

as to whether he relied on medical data or literature in reaching this opinion, Dr. Norcross stated that

his opinion is so fundamental that no one would ever study it and publish the results:  the entry in

Dr. Fletcher's handwriting clearly described an abnormality on physical exam, and it was not the

type of thing that could be studied.  (*Id.* at 74).  He testified that physicians learn to create medical

records based on common principles.  (*Id.* at 93).  One of these principles is that if you put

something under the section "abnormalities on exam", it indicates something found on physical

exam.  (*Id.*).  Finally, he testified that there  are standard ways that doctors record medical

information.  (*Id.* at 102).  A historical item should not be recorded under the physical examination

section.  (*Id.*).  He testified that physicians do not deviate from core principles and that it would not

be acceptable for a physician to put pieces of history under the physical examination section.  (*Id.*

at 103).  This is what he was taught at Duke; this is what he has seen taught in California, and this

is what he teaches physicians in his medical records course.  (*Id*).

Relying on *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 783 (10th Cir. 1999), Defendant argues

that this testimony is unscientific, untested speculation, that lacks the objectivity that is the hallmark

of the scientific method. Defendant objects to admission of Dr. Norcross's opinion on the grounds

that he has neither published an article nor taught a class on the forensic interpretation of medical

records. Defendant contends that there is no way to test the reliability of Dr. Norcross's opinions;

that the opinions are not subject to peer review and publication; that no known or potential rate of

error to the techniques are employed; and that there is no known "general acceptance" within a

particular scientific community in this regard.

### (3)  Proffered Opinions of Dr. Van Scoy-Mosher

Defendant also objects to admission of Dr. Van Scoy-Mosher's opinions that when Dr. Fletcher first saw Ms. Hiller in February 1998, that she had cancer in her breast and that the lump was clinically palpable at that time (Van Scoy-Mosher Depo at 26).  Dr. Van Scoy-Mosher further testified that because Ms. Hiller had a 6.5 centimeter cancer in August 2000, that any experts or literature would conclude that the lump had been present many years, probably in excess of four years, and easily would have been palpable 2.5 years earlier (*Id*. at 28).  When asked how to test this conclusion, Dr. Van Scoy-Mosher  stated that there is a general belief in oncology that by the time the average breast cancer is one centimeter in size, it has been present for four years; that even with a more aggressive than normal breast cancer, it would take many years to get to the size of 6.5 centimeters.  (*Id*. at 68).  When asked if he had any peer-reviewed, objective, generally accepted literature to support this opinion, he stated that although he could not refer defense counsel to a specific article off the top of his head, he did not think what he was saying is out of line with accepted oncological beliefs.  (*Id.*  at 66-67).  He testified that Ms. Hiller's history and his knowledge of biology of breast cancer support his conclusions on palpability.  (*Id*.).  He testified that he interprets Dr. Fletcher's medical notes as an acknowledgment that Ms. Hiller did complain of something in her breast.  (*Id*. at 103).  He testified that he would have no criticism of Dr. Fletcher if at the time of his treatment of Ms. Hiller, she did not have a lump that either she or Dr. Fletcher did find, or could have found.  (*Id.* at 65-66).

Defendant argues that Dr. Van Scoy-Mosher's testimony is inadmissible because there is too great an analytical gap between the data and his offered opinions.  He argues that these opinions are based upon a speculative assumption that a palpable mass was detected by him or by Ms. Hiller at

the time he made his medical notations.  Defendant claims that Dr. Van Scoy-Mosher failed to

provide a scientific or medical basis to support his conclusions regarding the biology of Ms. Hiller's

tumor, as well as his reliance upon what Defendant characterizes as hearsay statements in the

medical records of Drs. Gleason and Tauer.[7]

Plaintiff argues that Dr. Van Scoy-Mosher bases his opinions in this case on his review of

Dr. Fletcher's medical records, the medical records of Ms. Hiller's subsequent treating physicians,

and his extensive knowledge, experience, education and training, bases that are sufficiently reliable

to render the testimony of Dr. Van Scoy-Mosher admissible.

### C.  Conclusion on Reliability

The proffered expert testimony in the matter before this Court does not involve novel, unique

or controversial principles.  These doctors' testimony is properly characterized as clinical medical

testimony, as distinguished from the hard science of research or laboratory medicine.  The record

reflects that Plaintiff's experts based their opinions on the types of scientific data and utilized the

types of scientific techniques typically relied upon by medical experts in making determinations in

the field of clinical medicine.  *See Hopkins v. Dow Corning* Corp., 33 F.3d 1116, 1125 (9th Cir.

1994)(holding that the district court properly admitted expert testimony under *Daubert* that was

based on, *inter alia*, the doctor's clinical experience and review of the medical records).

In essence, Dr. Norcross read Dr. Fletcher's medical records and concluded that they

---

[7] The Court has ruled above that Plaintiff's experts shall be permitted to consider and testify about Ms.
Hiller's medical records taken by Drs. Gleason and Tauer.

document a dominant mass that Dr. Fletcher palpated but thought was benign.  In reaching this conclusion, Dr. Norcross relies not only upon Dr. Fletcher's  medical records, but upon the fact that cancer was later diagnosed in Ms. Hiller's breast, the content of the medical history that Ms. Hiller gave to her subsequent physicians, and upon Dr. Norcross's extensive experience in practicing medicine, reading medical records, creating medical records, and teaching other doctors how to create proper medical records.

Dr. Norcross's interpretation of Dr. Fletcher's medical records  provides an appropriate basis for Dr. Norcross's opinions, even in spite of the fact that these opinions contradict Dr. Fletcher's deposition testimony as to what he remembers from his physical examination of Ms. Hiller.  Dr. Norcross's opinions are scientifically valid because they are based on the type of data and methodology relied upon doctors typically in reaching opinions in their practice of clinical medicine.

The methodology of  interpreting another doctor's medical records was implicitly approved in a recent Tenth Circuit case.  Although a *Daubert* analysis was not employed, the case of *Hartnett v. O'Rourke*, 69 Fed.Appx. 971 (10th Cir. 2003)(*unpublished opinion*) cited  this same type of evidence as being adequate to defeat defendant's motion for summary judgment.  In *Hartnett*, plaintiff's expert (Dr. Gordon) opined as to what happened during surgery, based on  his review of surgical notes and his knowledge of how surgical notes are typically written.  This opinion contradicted the testimony of the two surgeons who performed the operation, as to what they remembered had occurred.

Further Dr. Gordon testified as to what would typically be dictated into a medical record, post-surgery.  He testified that he based this conclusion on his personal experience and from other operative notes he had read in general, concluding that surgeons use the same type of language most

15

of the time for the report.  In reversing the trial court's entry of summary judgment for defendant,

the Tenth Circuit even went so far as engaging in its own interpretation of the surgeon's medical

records, noting that the defendant doctor's written account of the first surgery undermines his own

testimony.  *Id*. at 978.   That Court concluded that Dr. Gordon's opinion was based upon the

surgeon's notes and Dr. Gordon's view of them, and that because the evidence from Dr. Gordon and

from the surgeon's own notes were arguably inconsistent with the defendant's deposition, that a

question as to whether defendant's testimony was credible had been raised, precluding the entry of

summary judgment.  This case is remarkably similar factually to the case at bar.  The Court

concludes that this type of methodology is reliable, pursuant to the *Daubert* and *Kumho Tire*

standards enunciated above.

Clinical medicine is concerned with the care and treatment of individual patents.  Thus, a

patient's medical records and personal history are adequate evidence upon which a physician may

base a clinical opinion. *See In re Joint E. & S. Dist. Asbestos Litig*., 52 F.3d 1124, 1136 & n.22 (2d

Cir. 1995).  In formulating his opinions, Dr. Norcross relies upon Ms. Hiller's medical records,

including the medical history that Ms. Hiller gave to her subsequent physicians.  Courts have

generally held that the methodology and data that diagnosing and treating physicians reasonably

consider good grounds for opinions or inference in medical practice are sufficiently reliable to form

the basis of a qualified medical expert's testimony in the field of clinical medicine. *See McCullock*

*v. H.B. Fuller Co*., 61 F.3d 1038, 1044 (2d Cir. 1995)(doctor's opinion based  entirely on his use of

clinical medical methodology and factors, including care and treatment, medical history, pathological

studies, training and experience, reference to various scientific and medical treatises; opinion was

admitted); *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998)(reaffirmed its holding in

16

*McCullock*, approving admission of a pulmonary medical expert's opinion based solely on clinical medical methodology, in the complete absence of any medical tests to determine effects of dosages received or doctor's opinion as to medical causation);  *Benedi v. McNeil-P.P.C., Inc*., 66 F.3d 1378, 1384 (4th Cir. 1995)(medical causation opinions based on methodology of expert's discipline found to be reliable.  The *Benedi* court stated:  "We will not declare [the clinical medicine] methodologies invalid and unreliable in light of the medical community's daily use of the same methodologies in diagnosing patients." *Id*.  *Hose v. Chicago Northwestern Transp. Co*., 70 F.3d 968, 974 (8th Cir. 1995)(clinical physician's opinion was reliable although based only on patient history, laboratory studies of chemical levels in patient's body and work clothes, clinical examinations, a series of MRIs and other doctor's reports); *Tassin v. Sears, Roebuck and Co*, 946 F. Supp. 1241, 1247-48 (M.D.La. 1996)(holding that for an expert's opinion to be considered reliable he must use the methodology of experts in his particular field).

Finally, Dr. Norcross's reliance upon his substantial experience in the medical profession is an appropriate basis for his opinions.  As noted by Plaintiff, the 2000 amendments to Rule 702 suggest that experience alone –  or experience combined with other knowledge, skill, training, or education –  provides a sufficient foundation for expert testimony.  "[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." FED.R.EVID. 702 Advisory Committee's Notes.  As noted in the *Kumho Tire*, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire* at 156.   These are the types of conclusions reached in many instances by these two doctors.  As stated above, both doctors have extensive experience in the medical field.  Dr. Norcross

is a   board certified family practitioner with thirty years experience and is particularly experienced in the area of medical records.

Many cases have relied upon the experience of an expert to conclude that their testimony is scientifically valid.  *See McCullock* at 1043 ("We find his background sufficient to permit his expert testimony on a throat ailment and its causes.");  *Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994)(holding that a doctor was qualified under *Daubert* to give an expert on standard of medical care based on thirty years of experience as a practicing, board-certified cardiologist and his review of the medical records).

Plaintiff acknowledges that the Court's gate-keeping function requires more than simply "taking the expert's word for it."  FED.R.EVID. 702 Advisory Committee's Notes.  A witness relying solely or primarily on experience must give a sufficient explanation of how the experience leads to the conclusion reached, why that experience is a sufficient basis for that opinion, and how that experience is reliably applied to the facts.  *Id*.  All proffered expert testimony must be properly grounded, well-reasoned, and not speculative before it may be admitted.  *Id*.

The Court concludes that Dr. Norcross's testimony is grounded in experience in his field and he has explained how his conclusions are so grounded.  Dr. Norcross adequately explained the underlying principles employed in medical note-taking and the usual methods employed.  These principles and methods are reliable and applied reliably to the facts of the case.  The Court notes Dr. Norcross's extensive experience and his use in rendering these opinions, of the same methodology that he uses in his own medical practice, as well as his reliance on the types of materials that he uses to make clinical judgments in his medical practice.  The Court concludes that Dr. Norcross's opinions are based on scientific knowledge and will assist the trier of fact to understand or determine

18

facts in this trial.  The Court concludes that in reaching these opinions, Dr. Norcross has employed the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. For all of these reasons, the opinions of Dr. Norcross, as proffered in the record before the Court, shall be admitted.

Similarly, the opinions of Dr. Van Scoy-Mosher are reliable and shall be admitted.  His proffered testimony is set forth at length above and focuses on the issue of the palpability of the lump in Ms. Hiller's breast during the time that she was under the care of Dr. Fletcher.  He testified that he relied on Ms. Hiller's medical history and his knowledge of biology of breast cancer to support his conclusions.  As did Dr. Norcross, in formulating his opinions, Dr. Van Scoy-Mosher relies upon the methodology and data that diagnosing and treating physicians reasonably consider good grounds for opinions or inference in their clinical medical practice.  Furthermore, Dr. Van Scoy-Mosher's reliance upon his substantial experience in the fields of internal medicine and medical oncology as outlined above provides a sufficient foundation for his expert testimony.  His testimony is grounded in experience in his field and he has explained how his conclusions are so grounded. His testimony, as proffered in the record before the Court, is based on scientific knowledge and will assist the trier of fact to understand or determine facts in this trial.  I conclude that in reaching these opinions Dr. Van Scoy-Mosher employed the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.  For all of these reasons, these opinions shall be admitted.

Defendant's motion for summary judgment is premised upon a finding by this Court that the testimony of both experts would be unreliable and inadmissible.  *See* Deft's Mot. for Sum. Judg., ¶¶5, 6.  The Court has failed to make such a finding, and indeed concludes that their testimony is admissible, as above stated.

Plaintiff filed a motion to supplement his responsive brief with a Tenth Circuit case that he had previously overlooked. The Court finds the motion to be well-taken and concludes that it shall be **granted**, and has considered the supplemental authority listed.

**WHEREFORE**, Plaintiff's Motion to Supplement His Response to Defendant's Motion for Summary Judgment Pursuant to FED.R.CIV.P. 56 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) is hereby **granted**.

**FURTHERMORE**, for the reasons stated herein, Defendant's Motion for Summary Judgment Pursuant to FED.R.CIV.P. 56 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)(Docket No. 78) is **denied**.

**IT IS SO ORDERED.**

_____
**SENIOR UNITED STATES DISTRICT JUDGE**